

home > US   world   opinion   sports   soccer   tech   arts   lifestyle   fa┃   all

**US news**

# US should return stolen land to Indian tribes, says United Nations

UN's correspondent on indigenous peoples urges government to act to combat 'racial discrimination' felt by Native Americans



A Native American at his home on Pine Ridge Reservation, South Dakota, which has some of the US's poorest living conditions. Photograph: Jennifer Brown/Star Ledger/Corbis

**Chris McGreal in Washington**
Friday 4 May 2012 18.46 EDT

 Save for later

This article is **3 years old**

Shares

272,951

A United Nations investigator probing discrimination against Native Americans has

called on the US government to return some of the land stolen from Indian tribes as a step toward combatting continuing and systemic racial discrimination.

James Anaya, the UN special rapporteur on the rights of indigenous peoples, said no member of the US Congress would meet him as he investigated the part played by the government in the considerable difficulties faced by Indian tribes.

Anaya said that in nearly two weeks of visiting Indian reservations, indigenous communities in Alaska and Hawaii, and Native Americans now living in cities, he encountered people who suffered a history of dispossession of their lands and resources, the breakdown of their societies and "numerous instances of outright brutality, all grounded on racial discrimination".



The stories you need to read, in one handy email

Read more

"It's a racial discrimination that they feel is both systemic and also specific instances of ongoing discrimination that is felt at the individual level," he said.

Anaya said racism extended from the broad relationship between federal or state governments and tribes down to local issues such as education.

"For example, with the treatment of children in schools both by their peers and by teachers as well as the educational system itself; the way native Americans and indigenous peoples are reflected in the school curriculum and teaching," he said.

"And discrimination in the sense of the invisibility of Native Americans in the country overall that often is reflected in the popular media. The idea that is often projected through the mainstream media and among public figures that indigenous peoples are either gone or as a group are insignificant or that they're out to get benefits in terms of handouts, or their communities and cultures are reduced to casinos, which are just flatly wrong."

Close to a million people live on the US's 310 Native American reservations. Some tribes have done well from a boom in casinos on reservations but most have not.

Anaya visited an Oglala Sioux reservation where the per capita income is around $7,000 a year, less than one-sixth of the national average, and life expectancy is about 50 years.

The two Sioux reservations in South Dakota – Rosebud and Pine Ridge – have some of

the country's poorest living conditions, including mass unemployment and the highest suicide rate in the western hemisphere with an epidemic of teenagers killing themselves.

"You can see they're in a somewhat precarious situation in terms of their basic existence and the stability of their communities given that precarious land tenure situation. It's not like they have large fisheries as a resource base to sustain them. In basic economic terms it's a very difficult situation. You have upwards of 70% unemployment on the reservation and all kinds of social ills accompanying that. Very tough conditions," he said.

Anaya said Rosebud is an example where returning land taken by the US government could improve a tribe's fortunes as well as contribute to a "process of reconciliation".

"At Rosebud, that's a situation where indigenous people have seen over time encroachment on to their land and they've lost vast territories and there have been clear instances of broken treaty promises. It's undisputed that the Black Hills was guaranteed them by treaty and that treaty was just outright violated by the United States in the 1900s. That has been recognised by the United States supreme court," he said.

Anaya said he would reserve detailed recommendations on a plan for land restoration until he presents his final report to the UN human rights council in September.

"I'm talking about restoring to indigenous peoples what obviously they're entitled to and they have a legitimate claim to in a way that is not devisive but restorative. That's the idea behind reconciliation," he said.

But any such proposal is likely to meet stiff resistance in Congress similar to that which has previously greeted calls for the US government to pay reparations for slavery to African-American communities.

Anaya said he had received "exemplary cooperation" from the Obama administration but he declined to speculate on why no members of Congress would meet him.

"I typically meet with members of the national legislature on my country visits and I don't know the reason," he said.

Last month, the US justice and interior departments announced a $1 billion settlement over nearly 56 million acres of Indian land held in trust by Washington but exploited by commercial interests for timber, farming, mining and other uses with little benefit to the tribes.

The attorney general, Eric Holder, said the settlement "fairly and honourably resolves

historical grievances over the accounting and management of tribal trust funds, trust lands and other non-monetary trust resources that, for far too long, have been a source of conflict between Indian tribes and the United States."

But Anaya said that was only a step in the right direction.

"These are important steps but we're talking about mismanagement by the government of assets that were left to indigenous peoples," he said. "This money for the insults on top of the injury. It's not money for the initial problem itself, which is the taking of vast territories. This is very important and I think the administration should be commended for moving forward to settle these claims but there are these deeper issues that need to be addressed."

*U.s. Marine Corps*
*(406) 373-8400*
*2913 Gabel Rd, Billings,MT 59102*

*MILITARY POWERS CHAPTER 15--INSURRECTION*

### Sec. 333. Interference with State and Federal law

The President, by using the militia or the armed forces, or both, or by any other means, shall take such measures as he considers necessary to suppress, in a State, any insurrection, domestic violence, unlawful combination, or conspiracy, if it--

(1) so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law, and the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection; or

(2) opposes or obstructs the execution of the laws of the United States or impedes the course of justice under those laws. In any situation covered by clause (1), the State shall be considered to have denied the equal protection of the laws secured by the Constitution.

I am not a public servant and I cannot be held to answer without an indictment by a grand jury. My child is not subject to impeachment, and must be returned to me. If you are insurrect to the laws of the United States, you are subject military action.

The President, Vice President and all civil officers of the United States, shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors.

TITLE 18 > PART I > CHAPTER 1 > § 3 Accessory after the fact
Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

TITLE 18 > PART I > CHAPTER 1 > § 4 Misprision of felony
Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

TITLE 18 > PART I > CHAPTER 93 > § 1918 Disloyalty and asserting the right to strike against the Government

**Return the Thomas Rockroads within 24 hours under law!**

Whoever violates the provision of section 7311 of title 5 that an individual may not accept or hold a position in the Government of the United States or the government of the District of Columbia if he—
(1) advocates the overthrow of our constitutional form of government;
(2) is a member of an organization that he knows advocates the overthrow of our constitutional form of government;
(3) participates in a strike, or asserts the right to strike, against the Government of the United States or the government of the District of Columbia; or
(4) is a member of an organization of employees of the Government of the United States or of individuals employed by the government of the District of Columbia that he knows asserts the right to strike against the Government of the United States or the government of the District of Columbia;
shall be fined under this title or imprisoned not more than one year and a day, or both.

**Title 42, U.S.C., Section 14141**
**Pattern and Practice**
**This civil statute was a provision within the Crime Control Act of 1994 and makes it unlawful for any governmental authority, or agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.**
**Types of misconduct covered include, among other things:**
**1. Excessive Force**
**2. Discriminatory Harassment**
**3. False Arrest**
**4. Coercive Sexual Conduct**
**5. Unlawful Stops, Searches, or Arrests**

**To say this in simple terms, if a civil servant commits a felony while in office, their impeachment is by constitution, of two witnesses of the overt act or one witness in open court. Since those in volved in my case have all written their crimes and signed under penalty of perjury, there only needs to be one witness to the crimes, where the evidence is hard and undisputable.**

III. PLEADINGS AND MOTIONS > Rule 8.
Rule 8. General Rules of Pleading
e) Pleading to be Concise and Direct; Consistency Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.
(f) Construction of Pleadings; All pleadings shall be so construed as to do substantial justice.

TITLE 28 > PART II > CHAPTER 40 > § 595 15 day notice of impeachment

_____ Date: _____
Signature of Parent

Signature of witness to the crime of kidnapping, admitted to in open court where only one witness need testify that the person has struck against the constitutional form of government.

_____ Date: _____
Signature of witness to the crime of insurrections to the laws;

Our son must be released forthwith; If our son is not released within the hour, will be calling in the military for the insurrections.

**Return the Thomas Rockroads within 24 hours under law!**

2 | Page

# Williams v. Lee

**358 U.S. 217**
**Williams v. Lee (No. 39)**
**Argued: November 20, 1958**
**Decided: January 12, 1959**
**83 Ariz. 241, 319 P.2d 998, reversed.**

- **Syllabus**
- **Opinion**, Black

### Syllabus

Respondent, who is not an Indian, operates a general store in Arizona on the Navajo Indian Reservation under a license required by federal statute. He brought this action in an Arizona state court against petitioners, a Navajo Indian and his wife who live on the Reservation, to collect for goods sold to them there on credit. They moved to dismiss on the ground that jurisdiction lay in the tribal court, rather than in the state court. *Held:* The motion should have been granted, since the exercise of state jurisdiction in this case would undermine the authority of the tribal courts over Reservation affairs, and hence would infringe on the right of the Indians to govern themselves, which right was recognized by Congress in the Treaty of 1868 with the Navajos, and has never been taken away. Pp. 217-223.

## TOP
### Opinion

BLACK, J., Opinion of the Court

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondent, who is not an Indian, operates a general store in Arizona on the Navajo Indian Reservation under a license required by federal statute. [n1] He brought this **[p218]** action in the Superior Court of Arizona against petitioners, a Navajo Indian and his wife who live on the Reservation, to collect for goods sold them there on credit. Over petitioners' motion to dismiss on the ground that jurisdiction lay in the tribal court, rather than in the state court, judgment was entered in favor of respondent. The Supreme Court of Arizona affirmed, holding that, since no Act of Congress expressly forbids their doing so, Arizona courts are free to exercise jurisdiction over civil suits by non-Indians against Indians though the action arises on an Indian reservation. 83 Ariz. 241, 319 P.2d 998. Because this was a doubtful determination of the important question of state power over Indian affairs, we granted certiorari. 356 U.S. 930. Originally, the Indian tribes were separate nations within what is now the United States. Through conquest and treaties, they were induced to give up complete independence and the right to go to war in exchange for federal protection, aid, and grants of land. When the lands granted lay within States, these governments sometimes sought to impose their laws and courts on the Indians. Around 1830, the Georgia Legislature extended its laws to the Cherokee Reservation despite federal treaties with the Indians which set aside this land for them. [n2] The Georgia statutes forbade the Cherokees from enacting laws or holding courts and prohibited outsiders from being on the Reservation except with permission of the State Governor. The constitutionality of these laws was tested in *Worcester v. Georgia,* 6 Pet. 515, when the State sought to punish **[p219]** a white man, licensed by the Federal Government to practice as a missionary among the Cherokees, for his refusal to leave the Reservation. Rendering one of his most courageous and eloquent opinions, Chief Justice Marshall held that Georgia's assertion of power was invalid.

> The Cherokee nation . . . is a distinct community, occupying its own territory . . . in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation is, by our constitution and laws, vested in the government of the United States.

6 Pet. at 561.

Despite bitter criticism and the defiance of Georgia, which refused to obey this Court's mandate in *Worcester*, [n3] the broad principles of that decision came to be accepted as law. [n4] Over the years, this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of *Worcester* has remained. Thus, suits by Indians against outsiders in state courts have been sanctioned. *See Felix v. Patrick,* **[p220]** 145 U.S. 317, 332; *United States v. Candelaria,* 271 U.S. 432. *See also Harrison v. Laveen,* 67 Ariz. 337, 196 P.2d 456. And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. *E.g., New York ex rel. Ray v. Martin,* 326 U.S. 498. But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive. [n5] *Donnelly v. United States,* 228 U.S. 243, 269-272; *Williams v. United States,* 327 U.S. 711. Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. *Cf. Utah & Northern Railway v. Fisher,* 116 U.S. 28.

Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation. To assure adequate government of the Indian tribes, it enacted comprehensive statutes in 1834 regulating trade with Indians and organizing a Department of Indian Affairs. 4 Stat. 729, 735. Not satisfied solely with centralized government of Indians, it encouraged tribal governments and courts to become stronger and more highly organized. *See, e.g.,* the Wheeler-Howard Act, §§ 16, 17, 48 Stat. 987, 988, 25 U.S.C. §§ 476 477. Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to **[p221]** them. *See* H.R.Rep. No. 848, 83d Cong., 1st Sess. 3, 6, 7 (1953). Significantly, when Congress has wished the States to exercise this power, it has expressly granted them the jurisdiction which *Worcester v. Georgia* had denied. [n6]

No departure from the policies which have been applied to other Indians is apparent in the relationship between the United States and the Navajos. On June 1, 1868, a treaty was signed between General William T. Sherman, for the United States, and numerous chiefs and headmen of the "Navajo nation or tribe of Indians." [n7] At the time this document was signed, the Navajos were an exiled people, forced by the United States to live crowded together on a small piece of land on the Pecos River in eastern New Mexico, some 300 miles east of the area they had occupied before the coming of the white man. In return for their promises to keep peace, this treaty "set apart" for "their permanent home" a portion of what had been their native country, and provided that no one, except United States Government personnel, was to enter the reserved area. Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in *Worcester v. Georgia,* was the understanding that the internal affairs of the Indians remained exclusively within **[p222]** the jurisdiction of whatever tribal government

existed. Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts. *See* the Navajo-Hopi Rehabilitation Act of 1950, § 6, 64 Stat. 46, 25 U.S.C. § 636; 25 CFR §§ 11.1 through 11.87NH. The Tribe itself has in recent years greatly improved its legal system through increased expenditures and better trained personnel. Today the Navajo Courts of Indian Offenses exercise broad criminal and civil jurisdiction which covers suits by outsiders against Indian defendants. [n8] No Federal Act has given state courts jurisdiction over such controversies. [n9] In a general statute, Congress did express its willingness to have any State assume jurisdiction over reservation Indians if the State Legislature or the people vote affirmatively to accept such responsibility. [n10] To date, Arizona has not **[p223]** accepted jurisdiction, possibly because the people of the State anticipate that the burdens accompanying such power might be considerable. [n11]

There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs, and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation, and the transaction with an Indian took place there. *Cf. Donnelly v. United States, supra; Williams v. United States, supra.* The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 564 566.
*Reversed.*

1. 31 Stat. 1066, as amended, 32 Stat. 1009, 25 U.S.C. § 262 provides:

Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians.

2. The Georgia laws are set out extensively in *Worcester v. Georgia,* 6 Pet. 515, 521-528. The principal treaties involved are found at 7 Stat. 18, 39.

3. For interesting accounts of this episode in the struggle for power between state and federal governments see IV Beveridge, The Life of John Marshall, 539-552; I Warren, The Supreme Court in United States History, c.19. *See also Cherokee Nation v. Georgia,* 5 Pet. 1.

4. *See The Kansas Indians,* 5 Wall. 737; *Ex parte Crow Dog,* 109 U.S. 556; *United States v. Kagama,* 118 U.S. 375; *United States v. Forness,* 125 F.2d 928; *Iron Crow v. Oglala Sioux Tribe,* 231 F.2d 89; *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624; Cohen, Federal Indian Law (Revision by the United States Interior Department 1958); 55 Decisions of the Department of the Interior 5644.

The Federal Government's power over Indians is derived from Art. I, § 8, cl. 3, of the United States Constitution, *Perrin v. United States,* 232 U.S. 478, and from the necessity of giving uniform protection to a dependent people. *United States v. Kagama, supra.*

5. For example, Congress has granted to the federal courts exclusive jurisdiction upon Indian reservations over 11 major crimes. And non-Indians committing crimes against Indians are now generally tried in federal courts. *See* 18 U.S.C. §§ 437-439, 1151-1163; Cohen, *op. cit. supra,* note 4, at 307-326.

6. *See, e.g.,* 62 Stat. 1224, 64 Stat. 845, 25 U.S.C. §§ 232 233 (1952) (granting broad civil and criminal jurisdiction to New York); 18 U.S.C. § 1162 28 U.S.C. § 1360 (granting broad civil and criminal jurisdiction to California, Minnesota, Nebraska, Oregon, and Wisconsin). The series of statutes granting extensive jurisdiction over Oklahoma Indians to state courts are discussed in Cohen, *op. cit. supra,* note 4, at 985-1051.

7. 15 Stat. 667. In 16 Stat. 566 (1871), Congress declared that no Indian tribe or nation within the United States should thereafter be recognized as an independent power with whom the United States could execute a treaty, but provided that this should not impair the obligations of any treaty previously ratified. Thus, the 1868 treaty with the Navajos survived this Act.

8. Young, The Navajo Yearbook (1955), 165, 201; id. (1957), 107, 110.

9. In the 1949 Navajo-Hopi Rehabilitation Bill, S. 1407, 81st Cong., 1st Sess., setting up a 10-year program of capital and other improvements on the Reservation, Congress provided for concurrent state, federal and tribal jurisdiction. President Truman vetoed the bill because he felt that subjecting the Navajo and Hopi to state jurisdiction was undesirable in view of their illiteracy, poverty and primitive social concepts. He was also impressed by the fact that the Indians vigorously opposed the bill. 95 Cong.Rec. 14784-14785. After the objectionable features of the bill were deleted, it was passed again and became law. 64 Stat. 44, 25 U.S.C. §§ 631-640.

10. Act of Aug. 15, 1953, c. 505, §§ 6, 7, 67 Stat. 590, provides as follows:

Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

. . . The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

Arizona has an express disclaimer of jurisdiction over Indian lands in its Enabling Act, § 20, 36 Stat. 569, and in Art. XX, Fourth, of its Constitution. *Cf. Draper v. United States,* 164 U.S. 240.

11. *See* H.R.Rep. No. 848, 83d Cong., 1st Sess. 3, 7 (1953); Secretary of Interior, Annual Report (1955), 247-248; id. (1956), 215-216; *id.* (1957), 253-254.

Article III Section 2. The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Amendment VII In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

I do not give up or waive my rights.
I do not willingly commit the crime of bribery by giving emoluments to **THE STATE OF MONTANA® CORPORA FICTA(s) including all judicial, executive and elective public servants receiving tax dollars.**
I do not willingly commit the crime of kickbacks by giving illegal attainders to **CORPORA FICTA(s) including all judicial, executive and elective public servants receiving tax dollars.**

# President, Vice President and all civil officers of the United States, shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors.

COURT RULE 29 When a party is not represented by counsel, service shall be made on the party, personally, by mail, or by commercial carrier. Ordinarily, service on a party must be by a manner at least as expeditious as the manner used to file the document with the Court.

The United States Constitution forbids both the federal and state governments to enact bills of attainder, in Article 1, Sections 9 and 10, respectively.

Within the U.S. Constitution, the clauses forbidding attainder laws serve two purposes. First, they reinforced the separation of powers, by forbidding the legislature to perform judicial functions—since the outcome of any such acts of legislature would of necessity take the form of a bill of attainder. Second, they embody the concept of due process, which was later reinforced by the Fifth Amendment to the Constitution. The text of the Constitution, Article I, Section 9; Clause 3 is "No Bill of Attainder or ex post facto Law shall be passed". The constitution of every State also expressly forbids bills of attainder.

Three type of cases: Court must provide what type this is.
1. Case in Admiralty.
   a. The court must prove that I am a member of the military subject to military law who are found guilty or may dismiss the charges based on the evidence and the case presented.
   b. The court must remove the admiralty flag and erect a United States flag.
   c. A **drumhead court-martial** is a court-martial held in the field to hear urgent charges of offenses committed in action. (while in time of war, only)
   d. Must prove I am a public servant and therefore can be impeached.

ARTICLE III, SECTION 3, CLAUSE 1
Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the
*Testimony of two Witnesses to the same overt Act, or*
*on Confession in open Court.*

# The confession on paper presented in court is the evidence required for the charge of treason.

You are fired for soliciting a bribe openly.

Page 1 of 2

**The clerk who demands you to pay a fee is soliciting a bribe. The clerk is now subject to removal from office for having solicited a bribe. All civil officers must be paid directly out of the U.S. Treasury.**

**Please be aware you are FIRED for soliciting a bribe.**

CONVERSION: An unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owners' rights. See fraudulent conversion . . .

FRAUDULENT CONVERSION: Receiving into possession money or property of another and fraudulently withholding, converting, or applying the same to or for one's own use and benefit, or to use and benefit of any person other than the one to whom the money or property belongs.

U.S. CRIMINAL CODE TITLE 18, CHAPTER 13 SECTIONS 241 & 242 make it a FELONY
to use or conspire to use COLOR OF LAW to enforce a Code or Regulation which results in the violation of a persons' Rights. Violaters will be prosecuted. [Exact law reproduced below]

NO ATTAINDERS, NO EMOLUMENTS & NOTWITHSTANDING.

1. NO ATTAINDERS, Our public officials cannot enact bills of attainders, such as tickets, inspection fees, state taxes, gas taxes, child support, fees for licenses, demand you pay for **ANY** service rendered by a public servant, their salary is only to be paid out of the United States Treasury. A **bill of attainder** (also known as an **act** or **writ** of attainder) is an act of legislature declaring a person or group of persons guilty of some crime, and punishing them, without benefit of a trial. The United States Constitution forbids both the federal and state governments to enact bills of attainder, in Article 1, Sections 9 and 10, respectively.

2. NO EMOLUMENTS & Emolument clause refers to a provision in Article I, Section 9. Clause 8, that forbids the United States from granting titles of nobility and restricts members of the government from receiving gifts from foreign states without the consent of the United States Congress.

3. NOTWITHSTANDING. All state laws, all state codes, all federal code, and federal rules of civil procedure which conflict with the constitution are contrary and void. Thing in the Constitution or Laws of **ANY** State to the Contrary notwithstanding. All laws which violate the constitution, enumerate our rights are likewise void, NOTWITHSTANDING.

4. The Constitution of the United States: Article. I. Section. 3. 7. Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

5. Article III. Section. 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;

6. The Trial of all Crimes, except in Cases of *IMPEACHMENT*, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed;

7.
You're Name_____

Date: _____

Name of Clerk who is instantly impeached for soliciting a bribe_____

You are fired for soliciting a bribe openly.

# Thirty-four Navy, Marine Corps, Army, and Air Force officers in command of naval and military installations alerted of felony and treason to the Constitution on the part of certain federal judges

A copy of the petition and personalized duplicate of the below letter sent to Vice Admiral Dixon Smith, Commander of the Navy Installations Command, was sent in the same mode to the following 33 other senior naval and military officers, each of whom has sworn an oath[1] to support and defend the Constitution of the United States against all enemies, foreign and domestic, i.e.:

Captain Monte Ulmer
Commanding Officer
Washington Navy Yard
1014 N Street, SE – Building 200
Washington, DC 20374-5001

Rear Admiral Markham K. Rich
Commander, Naval District Washington
United States Navy
1411 Parsons Avenue SE – Suite 200
Washington Navy Yard, DC 20374-5001

Rear Admiral Rick Williamson
Commander, Navy Region Mid-Atlantic
United States Navy
1510 Gilbert Street
Norfolk, Virginia 23511

Rear Admiral Patrick Lorge
Commander, Navy Region Southwest
United States Navy
937 North Harbor Drive
San Diego, California 92132-0058

Rear Admiral Mary M. Jackson
Commander, Navy Region Southeast
United States Navy
P.O. Box 102
Jacksonville, Florida 32212-0102

Captain Scott Gootee
Commanding Officer
Naval Air Station JRB New Orleans
400 Russell Avenue
New Orleans, Louisiana 70143

Captain James D. Hawkins
Commanding Officer
Naval Station Great Lakes
United States Navy
2601E Paul Jones Street
Great Lakes, Illinois 60088

Rear Admiral Jeffrey Ruth
Commander
Navy Region Northwest
United States Navy
1100 Hunley Road
Silverdale, Washington 98315

---

[1] "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." [Underline added.]  5 U.S.C. § 3331 *Oath of office.*

Captain Robert Clark Jr.
Commander
Naval Station Norfolk
United States Navy
Norfolk, Virginia 23505-0000

Captain Howard Wanamaker
Commanding Officer
Naval Air Station Jacksonville
United States Navy
Jacksonville, Florida 32212-5000

Captain Keith Hoskins
Commanding Officer
Naval Air Station Pensacola
United States Navy
150 Hase Road – Suite A
Pensacola, Florida 32508-1051

Captain Kurt Jones
Commanding Officer
Naval Base San Diego
United States Navy
3455 Senn Road
San Diego, California 92136-5084

Brigadier General Edward D. Banta
Commanding General
MCI West-MCB Camp Pendleton
United States Marine Corps
Marine Corps Base
Camp Pendleton, California 92055

Brigadier General Robert F. Castellvi
Commander
Marine Corps Installations East
Marine Corps Base Camp Lejeune
United States Marine Corps
Jacksonville, North Carolina 28542

Colonel David W. Maxwell
Commander
Marine Corps Base Quantico
United States Marine Corps
3250 Catlin Avenue
Quantico, Virginia 22134

Lt. General Stephen J. Townsend
Commanding General
XVIII Airborne Corps
United States Army
Fort Bragg, North Carolina 28310

Lieutenant General Perry L. Wiggins
Commander
United States Army North (Fifth Army)
Fort Sam Houston, Texas 78234

Colonel Matthew G. Elledge
Garrison Commander
United States Army
Fort Hood, Texas 76544

Lieutenant General Sean MacFarland
Commanding General
III Corps and Fort Hood
United States Army
Fort Hood, Texas 76544

Major General Stephen G. Fogarty
Commander
Cyber Center Command
United States Army
Fort Gordon, Georgia 30905

Lieutenant General Robert B. Brown
Commanding General
U.S. Army Combined Arms Center
   and Fort Leavenworth
United States Army
Fort Leavenworth, Kansas 66027

Major General Gary J. Volesky
Commanding General
101st Airborne Division (Air Assault)
   and Fort Campbell
United States Army
Fort Campbell, Kentucky 42223-5208

| | |
|---|---|
| Brigadier General Timothy P. McGuire<br>Commanding General JRTC<br>　and Fort Polk<br>United States Army<br>7090 Alabama Avenue – Bldg. 1454<br>Fort Polk, Louisiana 71459 | Brigadier General Roger Cloutier<br>Commanding General<br>Training Center and Fort Jackson<br>United States Army<br>Fort Jackson, South Carolina 29207 |
| Major General John G. Rossi<br>Commanding General<br>United States Army<br>Fort Sill, Oklahoma 73503 | General Mark A. Milley<br>Commanding General<br>U.S. Army Forces Command<br>Fort Bragg, North Carolina 28307 |
| Major General Austin S. Miller<br>Commanding General<br>U.S. Army Maneuver Center of<br>　Excellence<br>Fort Benning, Georgia 31905 | Major General Paul E. Funk II<br>Commanding General<br>1st Infantry Division and Fort Riley<br>United States Army<br>Fort Riley, Kansas 66442 |
| Colonel H. Charles Hodges<br>Commander, Joint Base Headquarters<br>United States Army<br>Joint Base Lewis-McChord<br>JBLM, Washington 98433 | Major General Richard D. Clarke<br>Commanding General<br>82nd Airborne Division<br>United States Army<br>Fort Bragg, North Carolina 28307 |
| Brigadier General David Harris<br>Commander<br>96th Test Wing<br>United States Air Force<br>Eglin AFB, Florida 32542-5487 | Colonel James C. Hodges<br>Commander, 87th Air Base Wing<br>Joint Base McGuire-Dix-Lakehurst<br>United States Air Force<br>JB MDL, New Jersey 08641 |
| Brigadier General Robert D. LaBrutta<br>Commander<br>502nd Air Base Wing and JBSA<br>United States Air Force<br>Fort Sam Houston, Texas 78234 | |

(Scroll down for letter to Commander of the Navy Installations Command)